IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICOLE TOMIAK,<br>Plaintiff, | CIVIL ACTION |
| v. | |
| UNILOG CONTENT SOLUTIONS, LLC,<br>Defendant. | NO.  25-1685 |

## MEMORANDUM OPINION

Nicole Tomiak alleges that her former employer, Unilog Content Solutions, LLC (Unilog), discriminated and retaliated against her because she was pregnant and took maternity leave.  She brings disparate treatment discrimination, retaliation, and hostile work environment claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and parallel claims under the Pennsylvania Human Relations Act (PHRA), 43 Pa. C.S.A. § 951 *et seq.*  She also brings a retaliation claim under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.*  Pursuant to Federal Rule of Civil Procedure 56, Unilog moves for summary judgment on all her claims.  For the reasons below, its motion will be granted in part and denied in part.

## I.    BACKGROUND

Unilog is an e-commerce platform provider.  Tomiak began working there in 2019 as a Digital Marketing Specialist.  Her responsibilities included assisting the business development team with lead generation, contributing to Unilog's website, planning an annual corporate event, and managing the firm's marketing database.  She thrived in her role, twice winning "Star Employee of the Quarter" and receiving perfect or near-perfect performance reviews in 2021 and 2022.  In her 2022 performance review, her supervisor at the time wrote: "Nicole is the epitome of [a] team player and embodies the characteristics of our company culture."

1

In May 2022, Tomiak learned she was pregnant.  Shortly thereafter, she passed along that news to Claire DeCurtis, Unilog's human resources manager, and Benjamin Stump, her direct supervisor.  She also told them of her intention to take maternity leave.

In the interim, there were a few changes to Unilog's marketing department.  For one thing, in July 2022, Tomiak was promoted to Demand Generation Manager, a position that tasked her with, among other things, developing and executing demand generation initiatives to drive new leads and nurture existing ones, measuring the efficacy of marketing campaigns and systems, and developing marketing materials.  She was also given a 25% base salary raise.  For a while, the marketing team had three employees: Tomiak, an individual who reported to her, and an independent contractor named Mark Okun.  The lean staffing meant that Tomiak had to perform work beyond her job description.  Then, to address the staffing shortage, Unilog added two marketing personnel, Rebecca Deno and Bryanna Vickers.

In January 2023, Tomiak gave birth to her daughter and began her pre-approved maternity leave.  While she was out, Unilog's executive team decided—given underperformance concerns and budget constraints—that a reduction in force ("RIF") was warranted.  Accordingly, in March 2023, approximately fifteen employees were let go, although none of them were from the marketing department.  Simultaneously, the company began a "massive transition of the business" that included changes to the marketing department's processes and the division of responsibilities among its personnel.

In the midst of this business transition, Tomiak began to suspect that Unilog, through Stump, held her pregnancy and maternity leave against her.  Specifically, while on leave, she received what she characterizes as a "significantly reduced" bonus.  In two prior quarters, the individual-performance component of her bonus had been $1,287.50 and $1,068.63.  Her most

recent bonus was $885.16, which was awarded for work done before she went on leave.  Stump arrived at that figure by multiplying Tomiak's maximum pay eligibility for a given quarter ($1,287.50) by the average completion rate of her four performance goals for the quarter (68.75%).  Specifically, he assigned her the following completion rates: Onboarding (100%), Vertical Campaigns (100%), Maternity Transition (75%), and Evolve (50%).  The "Maternity Transition" goal, which Stump and Tomiak had set together, measured how successfully Tomiak had passed off her responsibilities before going on leave.  Stump explained to Tomiak in an email about his rankings, that she did not receive 100% in that category because some of her responsibilities had not been successfully transitioned to others, partly for reasons beyond her control.  At the time, Stump had three direct reports; Tomiak's 68.75% bonus represented the median ranking among those employees (the highest being 72.5% and the lowest being 66.25%).

Additionally, Stump made changes to the marketing department's structure and processes as part of the firm's broader restructuring efforts.  When Tomiak returned to work, she learned that some of her job duties had been given to others.  For example, Vickers became the lead organizer for company events, and Okun now helped manage the marketing database.  There was also some confusion about the division of responsibilities between her role as Demand Generation Manager and Deno's responsibilities as Senior Brand Manager.

Stump also directed comments to Tomiak regarding his belief that she would be distracted by her baby.  First, shortly after returning, Tomiak told Stump that she could download an app to watch her daughter at daycare via security footage.  He responded—to be "fun and playful," as explained in his deposition—that downloading the app was not a "good idea because she would never do any work, never get any work done."  A second comment followed weeks later.  At the end of an investor meeting attended by Unilog executives, its Chief Operating

3

Officer (COO) Ace Rosenstein remarked, "Let it be known that, for the first time, Nikki didn't ask a question," to which Stump added, "That's because she is too busy looking at her watch to see if it's time to pick the baby up. She has mommy brain." Stump denies ever saying this. Other Unilog employees who were at the meeting and deposed in this case—Rosenstein, Deno, and Vickers—similarly do not remember it.

Finally, in May 2023, Stump conducted Tomiak's performance review for the previous year. This was her first evaluation as a Demand Generation Manager, as well as her first with Stump as the reviewer. He gave her an overall rating of 3.5, or "Meets Expectations," which was lower than her previous years' rankings of 5 and 4.3. In his comments, he noted: "Nicole is growing in her abilities and creativity and helping to drive success for the business." Tomiak was disappointed with the feedback. During a meeting to discuss the review, she expressed her disagreement with some of Stump's specific rankings. He defended them, adding by way of background that he never gave a rating of 5 and rarely gave a 4.

Concerned, Tomiak met with DeCurtis in human resources to talk about her bonus award and recent performance review. She said that Stump's assessments were unfair, that she should have been awarded the full amount of bonus, and that her review was "not right." She says she specifically raised a concern that Stump's evaluations were impacted by her pregnancy and maternity leave. She says DeCurtis told her to have a discussion with Stump. Meanwhile, DeCurtis remembers this meeting differently. She recalls that Tomiak was upset with her review and bonus but does not remember Tomiak drawing a connection between them and her pregnancy and maternity leave.

4

As all this was happening, Unilog's financial performance continued to decline.[1]  Budget restraints became "tighter and tighter" for all departments.  It was Stump's job to make cuts where he could.  In the March RIF, he made "significant" budget adjustments to the marketing spend, which avoided the need to lay off marketing employees.  In April, he scaled down Okun's independent contractor role and, along with it, Okun's compensation.

Then, he decided to eliminate Tomiak's position and her employment after focusing on the "fixed cost marketing spend," *e.g.*, base salaries in the marketing department.  He reasoned that it was the area under his purview least likely to "generate the most positive outcome for growing the business or recovering from the financial situation that [Unilog was] in."  And he decided to cut Tomiak because Unilog "could afford to eliminate" her job "with less impact to the performance of the business than the other roles."

On July 14, 2023, Tomiak was fired, about three months after returning from maternity leave and within one month of when she says she raised her concerns with DeCurtis.  That same day, Unilog rehired a former employee, Gordon McDonough, as a Lead Generation Specialist to work in the marketing department.  According to Tomiak, McDonough's lead generation responsibilities overlapped with her own and would have fallen under her purview.

## II.    LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

[1] The record indicates that Unilog's financial decline continued unabated through at least October 2024, when Stump himself was terminated due to budget constraints.

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of [her] burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

The moving party has the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. The nonmoving party must then present affirmative evidence from which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 257. Summary judgment will be entered if the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## III.    DISCUSSION

### A.  Title VII and PHRA Discrimination

Unilog first seeks summary judgment on Tomiak's disparate treatment discrimination claims under Title VII and the PHRA,[2] which prohibit employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a); 42 Pa. C.S.A. § 955(a). The Pregnancy Discrimination Act amended Title VII's definition of sex discrimination to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); *see also*

---

[2] Tomiak's Title VII and PHRA claims are "coextensive[]" and thus analyzed under the same legal standards. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

*Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 276 (3d Cir. 2024) ("[T]he PDA makes clear that Title VII's prohibition against sex discrimination includes pregnancy discrimination"). Similarly, the PHRA's prohibition against sex discrimination encompasses pregnancy discrimination. *Cerra v. E. Stroudsburg Area Sch. Dist.*, 299 A.2d 277, 280 (Pa. 1973). Here, Tomiak brings both sex and pregnancy discrimination claims.

On this summary judgment motion, her claims are assessed under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which framework first requires a plaintiff to establish a *prima facie* case of discrimination. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). If a plaintiff presents such a case, then the burden of production shifts to the defendant-employer to provide a legitimate, nondiscriminatory reason for its employment decision. *Id.* If the employer provides one, then a plaintiff can defeat summary judgment by pointing to evidence that the articulated reason is merely a pretext for intentional discrimination. *Id.*

### i. Tomiak Can Establish a **Prima Facie** *Case of Sex Discrimination but Not Pregnancy Discrimination*

The *prima facie* case for discrimination requires a plaintiff to establish that: (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment decision; and, (4) the circumstances of that adverse determination give rise to an inference of unlawful discrimination. *See id.* at 365 (citing *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580 (3d Cir. 1996)).

At the outset, it is necessary to pinpoint the employment decisions underlying Tomiak's discrimination claims. There is no dispute that Tomiak's termination qualifies as an adverse employment action, but she claims other actions qualify as well: the "removal" of her job

7

duties,[3] her lower-than-average bonus award, her "Meets Expectations" performance review, and Stump's offensive comments.  Tomiak maintains that each of the listed actions "undisputedly" constitutes an adverse employment decision under the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006).  In *Burlington*, the Court held that Title VII's *antiretaliation* provision broadly prohibits any employer conduct that might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 67-68 (quotation marks and citation omitted).  It went on to conclude that the plaintiff suffered actionable retaliation when she was reassigned to physically demanding, less prestigious tasks and suspended without pay for thirty-seven days.  *Id.* at 70-73.

*Burlington* has little purchase on Tomiak's discrimination claims.  It is a basic principle that opinions about a particular statutory provision do not necessarily provide rules for claims brought under another.  *Cf. Nken v. Holder*, 556 U.S. 418, 426 (2009) (explaining that "statutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole" (quotation marks and citation omitted)). *Burlington* itself underscores that point: the decision emphasizes that the scope of statutory workplace protections turns on the specific words used by Congress.  *See Burlington*, 548 U.S. at 61 ("The language of the substantive provision differs from that of the antiretaliation provision in important ways.").  Undertaking a careful analysis of the statutory text and history of Title VII's antiretaliation provision, the *Burlington* Court construed it to encompass more employer behavior than the differently worded antidiscrimination provision.  *See id.* at 67 (rejecting appellate decisions that "treated the antiretaliation provision as forbidding the same conduct

---

[3] This "decision" seems to more accurately reflect three separate determinations made by Stump: (1) deciding not to assign Tomiak a direct report despite earlier indications that he might do so; (2) temporarily reassigning Tomiak's responsibilities while she was on leave; and, (3) making some of those reassignments permanent upon her return.

prohibited by the antidiscrimination provision," as the provisions "are not coterminous"). Applying the decision to any context beyond a Title VII retaliation claim would be inappropriate; Tomiak errs by using it to identify the actionable conduct underlying her Title VII discrimination (and FMLA retaliation) claims.  A better source for her argument would have been *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).  There, the Supreme Court held that Title VII's antidiscrimination provision only requires establishing some "disadvantageous change in an employment term or condition." *Muldrow*, 601 U.S. at 354 (quotation marks and citation omitted).  The harm incurred need not be "significant," "serious," "substantial," or "any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* Tomiak does not, however, cite to this case, so the Court shall treat her termination as the only basis for her claims.

Proceeding to the other elements of the *prima facie* case, Unilog argues that Tomiak's pregnancy and sex discrimination theories fail for different reasons.

a.  <u>Pregnancy Discrimination</u>

Unilog argues that Tomiak cannot establish pregnancy discrimination for a simple reason: she was not pregnant at the time of her termination, meaning she cannot demonstrate her membership in a protected class.  *See, e.g.*, *Anderson v. Boeing Co.*, 694 F. App'x 84, 87 (3d Cir. 2017); *Solomen v. Redwood Advisory Co.*, 183 F. Supp.2d 748, 753-54 (E.D. Pa. 2002).  Indeed, she gave birth approximately six months before her dismissal.  And although Title VII protects women throughout the period in which they remain "affected by pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k), Tomiak does not tie her claim to being pregnant, her labor, or any related medical conditions of pregnancy or childbirth.  Thus, summary judgment will be granted on her pregnancy discrimination claims.

b.   Sex Discrimination

With respect to Tomiak's sex discrimination claims, Unilog argues that the circumstances of her termination do not give rise to an inference of discrimination.  The success or failure of that argument in a summary judgment motion "depends on the circumstances of the case." *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 118 n.13 (3d Cir. 1983).  Here, because Tomiak was terminated in the context of a corporate restructuring, she must establish that her responsibilities were transferred to employees outside of her protected class (*i.e.*, to a man). *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 n.4 (3d Cir. 2006).[4]  It is undisputed that her job duties were either completely dropped or redistributed to other employees, including Mark Okun. Moreover, there is a genuine dispute about whether Gordon McDonough—hired into the marketing department on the very same day that Tomiak was terminated—assumed her lead generation duties and effectively replaced her.

### ii.   The Nondiscriminatory Rationale for Tomiak's Termination

Under the second step of *McDonnell Douglas*, Unilog must identify a legitimate, nondiscriminatory reason for terminating Tomiak.  *C.A.R.S.*, 527 F.3d at 364.  Specifically, it "must provide evidence that will allow the factfinder to determine that the decision was made for

---

[4] Unilog argues that Tomiak must further establish that male employees were "similarly situated" to her, meaning they were "directly comparable to her in all material respects."  *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (citation omitted).  True, that ordinarily forms part of a plaintiff's *prima facie* burden.  *See, e.g.*, *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024).  But in this case, Unilog maintains that Tomiak was not similarly situated to any retained employees, not even to her colleagues in the marketing department.  Thus, the glaring issue with Unilog's position, taken to its logical end, is that Tomiak would have no way of demonstrating "discrimination inferentially" and would instead be confined to "the oft-impossible situation of having to offer direct proof of discrimination."  *Marzano v. Comput. Sci. Corp.*, 91 F.3d 497, 511 (3d Cir. 1996).  That would "seriously undermine legal protections against discrimination."  *Id.*  So, accepting Unilog's contention that Tomiak was not similarly situated to others, she need only establish that her responsibilities were reassigned to persons outside of her protected class.  *See, e.g.*, *Smith v. Thomas Jefferson Univ.*, 2006 WL 1887984, at *3 (E.D. Pa. June 29, 2006); *Sosky v. Int'l Mill Serv., Inc.*, 1996 WL 32139, at *6 (E.D.Pa. Jan. 25, 1996), *aff'd*, 103 F.3d 114 (3d Cir. 1996); *see also Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) ("[T]he fourth element must be relaxed in certain circumstances, as when there is a reduction in force.").

10

nondiscriminatory reasons." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

Unilog maintains that it terminated Tomiak as part of a RIF—a restructuring effort that was triggered by financial distress.   In early 2023, Unilog's executive team was confronted with budget constraints caused by underperformance.  In March 2023, the company undertook a "massive restructuring."  It terminated approximately fifteen employees but spared the marketing department because Stump made "significant" budget adjustments and reductions unrelated to headcount.  But as Unilog's financial performance continued to decline and budget restraints intensified, Stump was tasked with further reducing costs without jeopardizing the business's performance.  In his judgment, marketing was the least likely of the three departments under his purview to contribute to Unilog's financial recovery.  He further judged that the company "could afford to eliminate" Tomiak's position "with less impact to the performance of the business than the other roles."

Such evidence could convince a jury that Tomiak was terminated for a legitimate, nondiscriminatory reason.  *See, e.g.*, *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 923 n.17 (3d Cir. 1990) (concluding that a "company's poor economic performance and its need to cut costs" constitutes a legitimate basis for an adverse employment decision); *Andersen v. Mack Trucks, Inc.*, 118 F. Supp.3d 723, 740 (E.D. Pa. 2015) ("The termination of an employee in connection with a financially necessary RIF constitutes a legitimate, nondiscriminatory reason for the termination.").

### iii.    *Tomiak Can Establish that Unilog's Explanation Is Pretextual Under the Second* **Fuentes** *Prong*

Now, the burden shifts back to Tomiak to show that Unilog's legitimate explanation is a pretext for sex discrimination.  She "must make this showing of pretext to defeat a motion for

summary judgment." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426-27 (3d Cir. 2013). To do so, she must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve [Unilog's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause" of her termination. *Fuentes*, 32 F.3d at 764.

Evidence under the second *Fuentes* prong must go beyond the *prima facie* case, and it will usually take the form of an employer's prior discriminatory treatment of the plaintiff or other members of her protected class. *Id.* at 764-65; *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639 (3d Cir. 1993); *see also, e.g., id.* at 641 (crediting evidence that an employer tolerated racially prejudiced comments in the workplace and had never hired a black employee to an "office position" in the company's thirty-year history). The evidence must be able to convince a factfinder "not that the illegitimate factor was the *sole* reason for the decision," but rather that the decision was more likely than not "caused by bias." *Fuentes*, 32 F.3d at 764-65. In other words, "but for the protected characteristic," the plaintiff would not have been terminated. *Id.* at 764.

Tomiak has *"*come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision," *id.* at 765, to wit, the series of comments made by Stump. First, Stump told his colleagues that he had doubts about whether Tomiak would return from maternity leave. "For most new mothers," he explained in his deposition, "I always would put that expectation in the back of my mind." Second, at some point after returning from leave, Tomiak told Stump that she could download an app that would give her access to security camera footage at her daughter's daycare center. Stump advised her not to

12

install it.  Specifically, he said it was not a "good idea because she would never do any work, never get any work done."  Finally, during an investor meeting, one of Unilog's executives remarked that, "for the first time," Tomiak did not have any questions.  While that could have been true for any number of reasons, Stump chimed in that it was because she was "too busy" looking at the time and had "mommy brain."[5]  There is no evidence he made similar comments about new fathers.

When viewed in a light most favorable to Tomiak, Stump's comments manifest sex-based stereotypes about working mothers.  *See Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286-87 (3d Cir. 2009) (holding that sex stereotyping constitutes sex-based discrimination).  Specifically, they portray Tomiak as less dedicated to or focused on her work and simultaneously betray a lack of confidence on Stump's part in her ability to balance her job and family.  This bias comprises one facet of the "maternal wall," a term that broadly describes how working mothers' professional competence is often unfairly measured using traditional conceptions of gender roles—specifically, women as caregivers.  *See generally* Joan C. Williams, *The Maternal Wall*, Harv. Bus. Rev., Oct. 2004.  The "maternal wall" is rooted in a sensible recognition that all working parents—men and women—must balance competing work and family demands.  But it is discriminatory insofar as it assumes that, for working mothers in particular, "family duties trump those of the workplace."  *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 731 n.5 (2003).  "[T]he faultline between work and family," Chief Justice Rehnquist wrote in *Hibbs*, is "precisely where sex-based overgeneralization has been and remains strongest."  *Id.* at 738.  Accordingly,

---

[5] Although Stump denies making the comment, Tomiak's account must be accepted as true for purposes of summary judgment.  *See Big Apple BMW, Inc. v. BMW of North Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("When deciding a motion for summary judgment, . . . a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations.").

courts have held that a supervisor's comments made prior to a woman's termination, expressing apprehension about whether she could manage her career and family obligations, are evidence that her dismissal was because of her sex.  *See, e.g.*, *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 55, 57 (1st Cir. 2000) (concluding a plaintiff could establish pretext for her Title VII sex discrimination claim from evidence that, shortly before her termination, her direct supervisor "questioned whether she would be able to manage her work and family responsibilities"); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 115, 122-25 (2d Cir. 2004) (holding that "stereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex-based motive," and concluding a jury could find pretext from, among other evidence, supervisors' comments "express[ing] concerns about [the plaintiff's] child care arrangements" and whether she would show the "same level of commitment [she] had shown because [she] had little ones at home").

In seeking summary judgment, Unilog focuses solely on Stump's "mommy brain" remark, characterizing it as an isolated or stray comment that cannot support a finding of pretext. Unilog relies on the Third Circuit's en banc decision in *Keller*, which held that a factfinder could not draw an inference of age-based animus from a supervisor's comment, "If you are getting too old for the job, maybe you should hire one or two young bankers."  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1111-12 (3d Cir. 1997) (en banc).  While affirming that such a comment "certainly constitute[s] evidence" of age discrimination, the court held that the single remark was insufficient to enable an inference of pretext.  *Id.* at 1112.  It reasoned that the comment occurred four or five months prior to the plaintiff's discharge, concerned the hiring of other employees, and at best reflected uncertainty about whether the plaintiff's age impeded just one of his job responsibilities.  *Id.*

But *Keller* is distinguishable: Tomiak's evidence goes beyond a single remark, the "mommy brain" comment was made within a few weeks (if not days) of the decision to terminate her, and Stump's comments concerned her work generally, not just a specific responsibility.  Moreover, as explained above, the comments embody sex-based stereotyping.

Stump stated he terminated Tomiak based on two considerations: reducing fixed costs and assessing who would be most likely to "generate the most positive outcome for growing the business or recovering from the financial situation that [it was] in."  On the latter factor, the evidence reasonably suggests that Stump identified Tomiak—Unilog's longest-tenured marketing employee at the time—as the least-impact cut because he assumed she was "insufficiently devoted to work," *Back*, 365 F.3d at 121, at a moment when Unilog's financial conditions made employee devotion paramount.  Added to this evidence is the fact that, on the very day Tomiak was terminated, Stump hired a man into the marketing department to do work that Tomiak contends had been part and parcel of her role.  *See C.A.R.S.*, 527 F.3d at 370 (explaining that "evidence supporting the *prima facie* case is often helpful in the pretext stage").

"To discredit the employer's articulated reason, [Tomiak] need not produce evidence that *necessarily* leads to the conclusion that the employer acted for discriminatory reasons," just sufficient evidence for a factfinder to draw that conclusion.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (emphasis added).  Here, a reasonable jury could do so.  Accordingly, summary judgment is inappropriate on Tomiak's sex discrimination claims.

### B.  FMLA, Title VII, and PHRA Retaliation

Unilog also seeks summary judgment on Tomiak's FMLA, Title VII, and PHRA retaliation claims.  Under the FMLA, "employers are barred from considering an employee's FMLA leave 'as a negative factor in employment actions such as hiring, promotions or

15

disciplinary actions.'" *Lichtenstein*, 691 F.3d at 301 (quoting 29 C.F.R. § 825.220(c)).   This

claim is largely consonant with Tomiak's sex discrimination claims, but it posits that her use of

maternity leave—rather than or in addition to a protected characteristic—prompted her firing.

Meanwhile, Title VII and the PHRA prohibit employers from retaliating against an

employee for opposing a prohibited employment practice or making a charge of employment

discrimination.  42 U.S.C. § 2000e-3(a); 43 Pa. C.S.A. § 955(d).  On these claims, Tomiak

alleges she was terminated for voicing her concern that Stump was treating her unfairly because

of her pregnancy.

Tomiak's retaliation claims, like her discrimination claims, utilize the *McDonnell*

*Douglas* framework.  *Lichtenstein*, 691 F.3d at 302; *Kengerski v. Harper*, 6 F.4th 531, 536 n.3

(3d Cir. 2021).  Although the parties dispute whether Tomiak can establish a *prima facie* case of

retaliation, it is unnecessary to resolve whether she can.  Ultimately, she cannot establish pretext

for these claims, as she has failed to identify evidence "from which a factfinder could reasonably

either (1) disbelieve [Unilog's] articulated legitimate reasons; or (2) believe that an invidious

[retaliatory] reason" caused her termination.  *Fuentes*, 32 F.3d at 764.

### i.    Fuentes *Prong One*

The first *Fuentes* prong focuses on the employer's explanation itself.  It requires a

plaintiff to identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder *could* rationally find them 'unworthy of credence.'" *Id.* at 765 (quoting *Ezold v. Wolf,*

*Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).  Tomiak advances several facts

in an attempt to discredit Unilog's cost-cutting rationale.  Considered individually or

collectively, they do not establish pretext because they do not "contradict[] the core facts put

16

forward by [Unilog] as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).

### a. "Contradictory" Personnel Decisions

Tomiak first challenges the premise of Unilog's rationale: that it faced budget constraints. She notes that Unilog hired two marketing employees months before her termination. Moreover, she observes that no marketing employees were terminated in the March 2023 RIF. These decisions, she asserts, are inconsistent with Unilog's claim that financial pressures drove its later decision to eliminate her position.

There is no inconsistency. Rebecca Deno was hired in September 2022, and Bryanna Vickers was hired in December 2022. Meanwhile, the record indicates that Unilog's financial difficulties were first realized in January 2023. Thus, those hiring decisions predated the financial circumstances that Unilog claims later prompted Tomiak's termination.

Nor does Unilog's implementation of the March 2023 RIF—in which approximately fifteen non-marketing employees were terminated—undermine the financial rationale it presses here. For one thing, the record contains an undisputed explanation for why marketing personnel were spared: Stump made significant cuts elsewhere in order to retain marketing employees. Moreover, according to Unilog's explanation, its budget constraints became "tighter and tighter" even after the RIF, eventually prompting Tomiak's termination. Thus, on this record, the fact that Unilog initially avoided marketing layoffs does not contradict its stated reason for needing to do so at a later point. Rather, the decisions were made at different times under difficult financial conditions and warranted different approaches.

### b. Fixed Marketing Costs

Tomiak next argues that Unilog's explanation is pretextual because the company could

have reduced fixed marketing costs in other ways.  She contends that, if cost reduction had truly been Unilog's objective, it would have terminated Deno and Okun, whose salaries exceeded hers, and would not have hired Gordon McDonough into a lower-level marketing role on the same day she was terminated.

This argument improperly seeks to establish pretext by second-guessing Unilog's business judgment.  The Third Circuit has repeatedly stated that, to discredit an employer's stated reason, a plaintiff cannot merely show that the employer's decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765.  The relevant question is whether Unilog's explanation is so weak, inconsistent, or implausible that a factfinder could rationally disbelieve it, a question not answered by arguments about whether Unilog made "the best, or even a sound, business decision." *Keller*, 130 F.3d at 1109 (citation omitted).  In positing that alternative courses of action could have curtailed costs even further, Tomiak offers precisely such a misguided response.  Because "the factual dispute at issue is whether [retaliatory] animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent," *Fuentes*, 32 F.3d at 765, Tomiak cannot discredit Unilog's stated rationale by merely suggesting that different decisions might have achieved even greater savings.[6]

### c.  One-Person RIF

Next, Tomiak notes that she was the only employee terminated on July 14, 2023.  Based on her framing, it is unclear whether other employees were also laid off around the same time as

---

[6] Moreover, the undisputed record here shows that Unilog's chosen course of action successfully reduced the marketing's department's fixed costs by more than ten percent.  Stump testified that this reduction was "a significant move in the total cost basis for the department."  That evidence tends to confirm, rather than undermine, the veracity of Unilog's cost-cutting rationale.  Separately, Tomiak's attempt to compare her total compensation to McDonough's is beside the point; it ignores Unilog's asserted focus on reducing *fixed* costs and the fact that McDonough's base salary—the fixed-cost component of his compensation—was significantly lower than hers. *See Kautz*, 412 F.3d at 469 n.2 (explaining that the pretext inquiry must focus on "the employer's proffered reasons," "not alternative theories advanced by the plaintiff").

her, even if not on July 14 specifically.  Nevertheless, viewing the fact in a light most favorable to her, as the Court must do at summary judgment, it reflects that she was the sole termination in that RIF.

Third Circuit caselaw indicates that one-person RIFs are a relatively common business practice that, standing alone, do not tend to establish an inference of pretext.  *See, e.g.*, *Kautz*, 412 F.3d at 465-66; *Showalter v. UPMC*, 190 F.3d 231, 236-37 (3d Cir. 1999).  Indeed, although the Third Circuit has yet to formally define a RIF, the Sixth Circuit has explained that it "occurs when business considerations cause an employer to eliminate *one* or more positions within the company." *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (emphasis added). Ultimately, Tomiak's burden is to "present evidence contradicting the core facts put forward by [Unilog] as the legitimate reason for its decision." *Kautz*, 412 F.3d at 467; *see also, e.g.*, *Showalter*, 190 F.3d at 236-37 (holding that the sole security guard terminated in a RIF established pretext because he pointed to contradictory testimony about whether the employer had a fixed method for making seniority-based layoffs).  The fact that she was the only person laid off in July 2023 is not inconsistent with Unilog's assertion that it did so to reduce fixed marketing costs.

### d.  Other Arguments

Tomiak raises several other points that are also insufficient to establish pretext under the first *Fuentes* prong.

First, she notes that after her termination, her job responsibilities were transitioned to other marketing personnel rather than completely eliminated.  "This does not, by itself, demonstrate pretext," as "it is not unexpected that after a layoff some job responsibilities that were formerly held by the terminated employees would be shifted to remaining employees."

19

*Fowler v. AT&T, Inc.*, 19 F.4th 292, 302 (3d Cir. 2021).

Second, she contends that her termination contravened corporate policies that prioritized employees over contractors and established a "last hired, first fired" rule. The record does not support her claim. In Stump's deposition, as part of a line of questioning about the March 2023 RIF, Tomiak's counsel asked: "In the process of the reduction in force, did the company prioritize keeping Unilog employees over people in positions, contractors like Mark [Okun]?" Stump responded, "The company would – well, you always want to prioritize your employees first, yes." His answer stopped short of saying that Unilog had a general policy of laying off contractors before employees, and counsel did not follow up to confirm whether it did. Likewise, COO Rosenstein testified that he had adopted a "last hired, first fired" policy at some point in his career, but he did not say that Unilog had such a policy. Thus, Tomiak cannot establish that her dismissal was at odds with one of Unilog's employment policies, as she cannot establish there was any policy to begin with.

Third, she emphasizes that there is no contemporaneous, documentary evidence to support Stump's claim that he focused on fixed marketing costs when deciding who to terminate. She further contends that this lack of documentation establishes a reasonable inference of pretext. Not so. For purposes of summary judgment, Unilog permissibly relies on Stump's deposition testimony to establish his decision-making criteria. *See* Fed. R. Civ. P. 56(c)(1)(A) (affirming that facts can be established through depositions). It is not required to adduce documentary evidence, such as emails or handwritten notes, corroborating that testimony. Meanwhile, to survive summary judgment, Tomiak cannot claim "that there is some metaphysical doubt" as to how Stump selected who to terminate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, her burden is to point to record evidence

20

indicating inconsistencies or incoherencies in Stump's fixed-cost rationale, which she has failed to do.

Finally, she contends that Unilog's explanation has shifted during this litigation because her termination has been described as a "continued resizing," a "continued RIF," a "corporate restructuring," and a response to corporate "financial constraints."  Simply put, there is nothing materially inconsistent in these explanations.  They all boil down to a workforce structuring necessitated by the company's financial performance, which, as explained above, is a legitimate reason to terminate an employee.

***

In sum, because Tomiak has not identified "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions," *Fuentes*, 32 F.3d at 765, in Unilog's rationale, she cannot establish pretext under the first *Fuentes* prong.

### ii.    Fuentes *Prong Two*

Tomiak's retaliation claims fare no better under the second *Fuentes* prong, as she does not point to evidence from which a factfinder could believe a retaliatory reason more likely than not caused her termination.[7]  She asserts she "has set forth ample evidence from which a reasonable jury could either disbelieve Defendant's stated reason(s) for terminating Plaintiff or believe that Defendant's decision was motivated by Plaintiff's pregnancy."  But that assertion lacks specifics, omits record cites, and puzzlingly seems to forget that liability would be

---

[7] The Court assumes without deciding that the second prong applies to retaliation claims.  Whether it does appears to be an open question in the Third Circuit.  In FMLA retaliation suits, the Third Circuit has omitted the second prong when articulating the pretext framework.  *See, e.g.*, *Lichtenstein*, 691 F.3d at 309-10; *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014).  Meanwhile, the Circuit's leading Title VII retaliation cases affirm that plaintiffs must demonstrate pretext but do not elaborate on how they might do so.  *See, e.g.*, *Kengerski*, 6 F.4th at 536 n.3, 541; *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).

21

predicated on retaliation, not pregnancy discrimination. Bald statements and broad gestures toward unspecified evidence are insufficient to defeat summary judgment. *See Ridgewood Bd. of Educ. V. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (providing that conclusory allegations and arguments do not raise triable issues precluding summary judgment), *superseded by statute on other grounds*, Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108–446, 118 Stat. 264, *as recognized in P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009). Summary judgment must therefore be granted to Unilog.

### C. Hostile Work Environment

Lastly, Unilog seeks judgment on Tomiak's claim of a hostile work environment under Title VII.[8] To prevail on this claim, a plaintiff must establish that:

> (1) she suffered intentional discrimination on the basis of a protected characteristic; (2) the discrimination was "severe or pervasive"; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and, (5) there was *respondeat superior* liability.

*Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). The parties dispute the "severe or pervasive" element only.

Title VII is not a "general civility code," so "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" is not actionable. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation marks and citation omitted). Instead, to qualify as "severe or pervasive," the alleged discriminatory behavior, viewed as a whole, must be so egregious that it "'alter[s] the conditions of the victim's employment and create[s] an abusive working

---

[8] There is no indication that Tomiak asserts a claim for the same under the PHRA.

22

environment.'" *Nitkin*, 67 F.4th at 570, 573 (alteration omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  The conduct can be severe, pervasive, or both.  *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 214 n.12 (3d Cir. 2017) ("The 'severe or pervasive' standard is disjunctive . . . .").  "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) (quotation marks and citation omitted).  Tomiak grounds her claim in the following facts: (1) the "removal" of her job responsibilities; (2) Stump's comment about the daycare security footage; (3) Stump's "mommy brain" comment; and, (4) her performance review.[9]

According to Tomiak's own authorities, harassment is severe or pervasive where a plaintiff is subjected to racist or misogynistic beratement or to physical threats, from multiple coworkers, for a prolonged period of time.  *See, e.g.*, *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (reversing summary judgment where, for six years, black plaintiffs and other black employees were racially harassed by coworkers and managers on a daily basis, openly undermined, and forced to perform menial jobs); *Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006) (holding that a jury could find severe or pervasive harassment where a plaintiff was verbally insulted by a particular employee two to three times a week for nineteen months, physically threatened on multiple occasions by another, and the repeated target of

---

[9] She also points to Stump's comment expressing his doubt about whether she would return from leave.  There is no evidence that she knew of this remark prior to this litigation.  It will therefore not be considered.  She also bases her claim on unspecified "other examples of discriminatory and retaliatory actions," but she fails to provide specifics or cite the record, in contravention of her burdens at summary judgment.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ."); *Nitkin*, 67 F.4th at 571 ("[T]he plaintiff must set forth specific facts establishing a triable issue." (quotation marks and citation omitted)).

vandalism to her car when it was parked in the office parking lot), *overruled in part on other grounds by Burlington*, 548 U.S. at 53. Furthermore, harassment is severe where there is a persistent pattern of sexual propositioning and obscene conduct toward the plaintiff. *See, e.g., Moody*, 870 F.3d at 215 (vacating summary judgment on a hostile work environment claim where the plaintiff testified that a male coworker coerced her into trading sex for work, frequently made sexually charged comments, inappropriately touched her, and exposed himself to her). That is not what happened here.

To start, the relative infrequency of Stump's conduct indicates that his actions were not severe or pervasive. *See Nitkin*, 67 F.4th at 571 (directing courts to "consider 'the frequency of the allegedly discriminatory conduct'" (internal brackets omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The four actions identified by Tomiak—Stump's two comments, the "removal" of her job responsibilities, and her performance review—occurred over approximately five to six months. That is both more sporadic and short-lived than the conduct in *Aman* and *Jensen*, which occurred multiple times a week for at least a year and a half, as well as the conduct in *Moody*, where the plaintiff's supervisor "often" groped and sexually propositioned her over the course of three months. *Moody*, 870 F.3d at 210.

Moreover, "the nature and severity" of Stump's misconduct also suggests that it is not severe or pervasive. *Nitkin*, 67 F.4th at 571. Stump's remarks are arguably the most discriminatory conduct grounding Tomiak's hostility claim. Yet the severe or pervasive standard is "sufficiently demanding" such that it draws a distinction between "the sporadic use of abusive language, gender-related jokes, and occasional teasing," and workplace rhetoric that is "'physically threatening or humiliating.'" *Faragher*, 524 U.S. at 787-88 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Only comments of the latter variety properly support

24

a hostility claim.  *Id.*  Here, Stumps remarks were obviously not physically threatening.  And while there can be no doubt they were offensive and shed insight on the motives for her termination, only particularly salacious conduct is "humiliating" enough to support a hostility claim.  Essentially, the plaintiff must have been the victim of persistent and serious sexual harassment.  *Compare Moody*, 870 F.3d at 215 (sustaining a hostility claim at summary judgment where a coworker "made sexually charged comments to her" and sent her a text stating "am I getting all three holes"), *with Nitkin*, 67 F.4th at 568, 571-73 (holding that a coworker's seven, sexually explicit and misogynistic remarks—such as "women can get anything they want from their husbands or any man, because they can just withhold sex," "he had sex with loose women," and "women who have big tits either show them off or hide them"—could not "fairly be called severe or pervasive").  If the "obnoxious, unprofessional, and inappropriate" remarks made in *Nitkin* were insufficient at summary judgment because, despite the remarks' sexual nature, the coworker never "propositioned [the plaintiff] for a date or sex," then Stump's non-sexual comments are also "not sufficiently 'extreme' to create a hostile work environment." *Nitkin*, 67 F.4th at 571-72 (quoting Faragher, 524 U.S. at 788).  Lastly, the remaining conduct— the reassignment of her job responsibilities and "negative" performance review—simply does not rise to the level of severe or pervasive conduct on the facts presented here.  Accordingly, summary judgment will be granted on this claim.

An appropriate order follows.


BY THE COURT:

S/ **WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, C.J.**

25